## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | |
|---|---|
| BIDDEFORD INTERNET CORPORATION )<br>D/B/A GREAT WORKS INTERNET and GWI )<br>VERMONT, LLC, )<br>     **Plaintiffs,** )<br>)<br>v. )<br>)<br>ESAT CENTRAL VERMONT )<br>TELECOMMUNICATIONS DISTRICT, )<br>VERMONT ISP OPERATING COMPANY, )<br>COREY KLINCK, ANDREW OBERHOLZER, )<br>And DOES 1-10, )<br>     **Defendants.** ) | Case No. 25-cv-745 |

### VERIFIED OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Defendants Corey Klinck and Andrew Oberholzer (the "Employees") oppose the Motion for Preliminary Injunction filed by Plaintiffs ("GWI") as follows. This Opposition refers to the East Central Vermont Telecommunications District as "ECFiber" or the "District" and to Vermont ISP Operating Company as "VISPO."

Defendants have verified this Opposition, attesting that the factual allegations below regarding their employment with GWI and the circumstance under which they signed the agreements GWI now seeks to enforce are true and accurate.

## I.    Introduction.

Near the end of ECFiber's initial 10-year operating agreement, GWI took over the administration of the ECFiber network. GWI inherited an existing network infrastructure and hired many employees who had built, maintained, and administered that infrastructure. GWI did not ask its new employees to sign non-competition agreements upon hiring them.

GWI's operating agreement is set to expire on December 31, 2025. Earlier this year, as things grew contentious between the District and GWI, it became very clear that the District

would not ask GWI to continue operating the ECFiber network in 2026 and beyond. The District formally notified GWI of its intent not to renew on February 19, 2025, but that formal notification followed an increasingly contentious back-and-forth in which the proverbial writing was on the wall that the District would not renew GWI's contract.

Only after it became clear to GWI that the District would not likely renew its contract did GWI ask its employees who worked on the ECFiber network to sign new employment agreements with restrictive non-compete covenants. When it did so, GWI knew just how bad things were between it and the District, and that the District did not intend to renew the ECFiber contract into 2026. For employees whose job responsibilities were all or mostly related to administering the ECFiber network, that information would have been highly relevant to their decision to sign a non-competition agreement and stay with GWI beyond 2025 – after all, without the ECFiber operating contract, all or nearly all of their job responsibilities would disappear.

But when GWI asked the Employees to sign non-competes, it did not disclose the status of contract negotiations with the District. Rather, it led the Employees to believe that they would be working on the ECFiber network for years to come and that their continued loyalty to GWI would be rewarded through generous retention bonuses designed to take effect no sooner than 18 months from signing – *i.e.*, after the end of GWI's contract to operate the ECFiber network. (*See* Doc. 1-1, § 3.)

The conceit of GWI's ploy is clear: GWI intended to lock up the workforce familiar with ECFiber's network by inducing them to sign non-competition agreements on incomplete information so the District would have no choice but to pay GWI's ransom and renew the contract. In doing so, GWI withheld critical information from its employees that would have been material to their decisions to sign a non-competition agreement. The law does not permit

2

such tactics, and for that reason (and a few others) GWI is not entitled to enforce the agreements that it secured under false pretenses to create a monopoly on the local workforce capable of administering the ECFiber network.

## II.    Necessary Facts.

The Employees presume that the Court is familiar with the history of ECFiber, GWI, and VISPO via the simultaneously-filed briefs in this docket as well as the briefing in Docket No. 25-cv-354. This Opposition sets forth the facts necessary to appreciate the circumstances under which GWI caused the Employees to sign the agreements that it now seeks to enforce. *See Sys. & Software, Inc. v. Barnes*, 2005 VT 95, ¶ 4 (whether to enforce non-competition agreement requires consideration of subject matter of contract and conditions under which contract is to be performed) (quotation omitted).

### A.    The Employees' History And Job Responsibilities.

Corey Klinck worked for ValleyNet, which preceded GWI as administrator of the ECFiber network, from 2011 to 2023. Mr. Klinck joined GWI in early 2023 when GWI assumed ValleyNet's responsibilities as administrator of the ECFiber network. Upon his hiring at GWI, GWI did not ask Mr. Klinck to sign an employment agreement containing a covenant not to compete. Mr. Klinck's primary job responsibility was designing and maintaining part of ECFiber's network infrastructure – specifically, working on "boxes" that facilitate the interconnectedness of the network and connect that network to the larger Internet. During his time at GWI, Mr. Klinck worked almost exclusively on the ECFiber network, but was also involved to some extent with a neighboring network called Lyme Fiber.[1]

---

[1]    Lyme Fiber is an Internet provider across the Connecticut River from the ECFiber network territory in New Hampshire. It came into existence when ValleyNet was administering ECFiber, and so GWI inherited it along with ECFiber. Lyme Fiber "piggy backs" off the ECFiber network to get online, so in many ways it is an outgrowth of the ECFiber network. Mr. Klinck's involvement with Lyme Fiber pre-dates his employment with GWI.

Andrew Oberholzer joined GWI in June of 2023. He worked on Mr. Klinck's team and was primarily responsible for working with Mr. Klinck to configure and maintain the "boxes." He also assisted field technicians when they called in for technical support. Mr. Oberholzer's work was almost exclusively limited to the ECFiber network. Like Mr. Klinck, Mr. Oberholzer did not sign an employment agreement containing a covenant not to compete when he joined GWI.

Both Mr. Klinck and Mr. Oberholzer live in ECFiber's service territory, and both sought employment with GWI specifically to work on the ECFiber network that serviced their communities. Nearly all their job responsibilities at GWI related to ECFiber; they held no particular affinity for GWI other than as the entity that operated ECFiber. It was and is important to both Mr. Klinck and Mr. Oberholzer that their work dedicates them to developing and maintaining robust, reliable broadband Internet for their communities, families, friends, and neighbors.

During the time that Mr. Klinck and Mr. Oberholzer worked for GWI, the ECFiber network expanded its reach from 23 municipalities to 31. That expansion fulfilled the vision of ECFiber to provide broadband Internet service to a specific part of rural Vermont that did not previously have access to it.

In the course of their work on the ECFiber network, neither Mr. Klinck nor Mr. Oberholzer obtained information from GWI that was identified as confidential or proprietary. And it does not make sense that they would have obtained such information. In large part the ECFiber network infrastructure and configuration pre-dated GWI's operation of the network, and the network assets belong to the District, not GWI. Moreover, the "boxes" that Mr. Klinck and Mr. Oberholzer work with are commercially available, and how to configure them is industry knowledge that Mr. Klinck and Mr. Oberholzer had prior to joining GWI.

**B. Things Sour Between ECFiber And GWI.**

GWI acknowledges that on February 19, 2025, ECFiber formally notified GWI of its intent not to renew the operating agreement. (Doc. 1, ¶ 24). But as detailed in ECFiber's simultaneously filed Opposition, ECFiber made its dissatisfaction with GWI's performance clear prior to formally noticing its intent not to renew the operating agreement. Indeed, the District was so dissatisfied that its counsel sent a harshly-worded cease and desist letter to GWI on February 12, 2025 and GWI responded with a lawsuit on February 24, 2025. (*See* District Opposition.)

It is against this backdrop that the Court should consider what happened next. When things started to go south between GWI and ECFiber, neither Mr. Klinck nor Mr. Oberholzer had non-competition agreements, and upon information and belief, neither did any other GWI employee who worked on the ECFiber network. Why, then, did GWI suddenly ask "almost all" of its employees to sign new non-competition agreements? (Motion at 6.) As explained in the following section, GWI's plan appears to have been to make hostages of its employees by inducing them to sign far-reaching non-compete agreements without disclosing GWI's likely, imminent demise as the ECFiber network operator and using those agreements as leverage to force ECFiber to renew GWI's contract at a higher per-subscriber rate.

**C. GWI Asks The Employees To Sign Non-Competition Agreements.**

Once GWI realized that the District would not renew its operating agreement, it sought leverage to change that outcome. Indeed, GWI alleges that it took on ECFiber's network at "grossly below-market compensation," and so it was presumably banking on the District renewing the contract with better terms. (Doc. 1 at ¶ 22.)

In early 2025, GWI sent new employment contracts to Mr. Klinck, Mr. Oberholzer, and –

upon information and belief – most other GWI employees who previously worked on the ECFiber network. Below is what each of the Employees recalls GWI told them about those contracts.[2]

GWI held a video conference with Mr. Oberholzer and other employees led by GWI's then-CEO Kerem Durdag some time in late February or early March of 2025. Mr. Durdag informed the employees that they were doing a great job and that GWI wanted to reward them with additional compensation, and presented the new employment agreements as the means to raise their future pay for the job well done. Neither Mr. Durdag nor anyone else from GWI mentioned during the video conference that the District had already communicated its intent not to renew GWI's contract, that the District sent a cease-and-desist letter, or that GWI had filed a lawsuit against the District. Rather, Mr. Durdag led Mr. Oberholzer and other employees to believe that they would be working on the ECFiber network for many years to come and structured retention bonuses in the new agreements to payout no sooner than 18 months after execution.

Both before and after Mr. Oberholzer signed the agreement, GWI represented to him that the District would maintain GWI as its network administrator into 2026 and beyond. Had Mr. Oberholzer known what GWI knew – that the District was sending very clear signals that it would not renew GWI's contract – he would not have signed the new employment agreement with the non-competition covenant and would have recognized the retention bonuses for what they were: an illusory promise.

---

[2] It bears noting that GWI's filing is sparse on details and does not include anything about the circumstances under which it asked the Employees to sign the non-competition agreements. It does not include a copy of Mr. Oberholzer's agreement, nor does it allege when he was asked to sign it. The Employees rely on their recollections because they no longer have access to any GWI documents. The context under which GWI asked the Employees to sign new employment agreements containing a restrictive non-compete covenant is highly relevant to the Court's assessment of whether to enforce those covenants. *Sys. & Software, Inc. v. Barnes*, 2005 VT 95, ¶ 4.

Mr. Klinck had several conversations with GWI's Vermont leader, Tom Cecere, regarding his new proposed employment agreement in late February and/or March of 2025. Mr. Klinck was somewhat aware of the District's dissatisfaction with GWI, but his information was limited to what was publicly known. Because Mr. Klinck was concerned that the District would not renew the contract with GWI, he asked Mr. Cecere about it directly. Mr. Cecere did not disclose any of the information that we now know GWI was aware of at that time – including the contents of the cease-and-desist letter – instead assuring Mr. Klinck that ECFiber had only rebuffed GWI's *initial* offer and would ultimately renew the operating contract. Mr. Klinck was vaguely aware of a legal proceeding, but Mr. Cecere did not share those details and was quick to reassure Mr. Klinck the District would renew the operating agreement. Like Mr. Oberholzer, Mr. Klinck never would have signed a new employment agreement containing the non-compete covenant had he known the true state of affairs between the District and GWI.

Notably, the only incentive offered by the new employment agreement beyond continuing to work at GWI was a bonus structure that would pay out no sooner than 18 months from signing. Mr. Oberholzer and Mr. Klinck's job responsibilities were almost entirely related to operating components of the ECFiber network. For that reason, both signed the new employment agreements under the belief – which GWI did nothing to dispel and, in fact, affirmed – that GWI would continue operating the ECFiber network for the foreseeable future. GWI knew that premise was shaky at best. But GWI did not disclose their doubts to the Employees when it asked them to sign new contracts that would force them to seek new livelihoods should, as noticed, the District not renew GWI's contract.[3]

---

[3]    GWI will likely argue that it planned to find other work for the Employees if the District did not renew the contract. The Court should view that argument with skepticism given that ECFiber makes up the majority of GWI's business in Vermont. Regardless, whether GWI planned to find the Employees replacement work misses the point. It should be the *Employees'* decision whether to stay with GWI in a post-ECFiber world. By not telling them the whole story, GWI deprived the Employees of the ability to intelligently make that decision.

III.     **Argument.**

Plaintiffs' Motion fails for three reasons, each of which touches on one or more of the

conditions Plaintiffs must establish to be entitled to preliminary injunctive relief.

**A.  The Agreements Were Induced By Misrepresentations.**

First, Plaintiffs are unlikely to succeed on the merits of this litigation because the

agreements they seek to enforce were procured through willful misrepresentations.  Because

GWI procured the agreements under false pretenses, the equities favor the Employees and

support finding that an injunction would not be in the public interest.

"It is well established that a party induced into a contract by fraud or misrepresentation

can rescind the contract and avoid liability for any breach thereon."  *Sarvis v. Vermont State*

*Colleges*, 172 Vt. 76, 80, 772 A.2d 494, 498 (2001) (citation omitted).  "A misrepresentation is

fraudulent when made with knowledge of its falsity.  Where the procurer of a statement knew it

was false, materiality is not required."  *Id.* (citations omitted).  Misrepresentation can occur by

omission.  *See id.* at 82 (referring to "assertions and omissions"); *see also Woodling v. Garrett*

*Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) ("[E]ven if the facts explicitly and implicitly represented

are literally true, there may still be a misrepresentation if the statement is a half-truth because it

omits reference to material unfavorable matter.").

When GWI asked the Employees to sign the agreements it now seeks to enforce, GWI, as

employer, had much more information than the Employees did about the state of play with the

District such that the consideration underlying the non-compete covenant—a bonus to be paid, at

soonest, in 18 months' time—was an empty promise.  Specifically, GWI withheld from the

Employees the fact that things had gotten so bad that the District sent a cease-and-desist letter

8

and GWI responded with a lawsuit.  Both of those facts would have alerted the Employees to a much higher risk of non-renewal than they appreciated at the time.[4]

Because the Employees both worked almost exclusively on the ECFiber network at GWI, GWI's prospects for continuing to manage the network beyond 2025 was material information to their decision to sign new employment agreements in early 2025.  GWI had a duty to disclose to the Employees up-to-date information about its deteriorating relationship with the District, and to honestly forecast the likelihood that the District would not renew the operating agreement, before asking them to sign new employment agreements.  *See Pearson v. Simmonds Precision Prods., Inc.*, 160 Vt. 168, 170-171 (Vt. 1993) (holding employer had duty to disclose information about likely prospect of imminent job loss to employee prior to employee signing employment contract).  GWI did not do that, instead painting an inaccurate, rosy picture that belied reality to induce the Employees to sign and use their continued employment as leverage in negotiating a contract renewal with ECFiber.

Put another way, the Employees both desired to continue working on the ECFiber network.  Administering aspects of that network constituted almost all of their job responsibility at GWI, which served to maintain critical infrastructure in the communities where they live.  The Employees believed, based on GWI's representations, that signing the non-competition agreement would allow them to continue to work on the ECFiber network.  In reality, it would have the effect of <u>preventing</u> them from doing that.  When considering whether to sign a contract, it is elemental for the signer to know whether his signature will accomplish his goal or frustrate it.

_____

[4]      GWI will likely argue that, although legal fur was flying, both it and the District were expressing hope of a contract renewal at that time, and were engaged in good-faith discussions.  It is difficult to assess how realistic any such hope was at the time, but the point is that the Employees did not have the full picture.  GWI had full view of the state of negotiations but did not share that information with the Employees, who had none.  As a result, the Employees were deprived of the opportunity to assess the likelihood of contract renewal for themselves.

GWI knew that its representations regarding the ECFiber contract were both false and incomplete, so they need not be material to void the contracts. Regardless, those representations and omissions were highly material to the Employees' decisions to sign. Mr. Klinck and Mr. Oberholzer found meaning in their jobs at GWI because they were able to build and maintain robust Internet for the communities where they live. They had (and continue to have) little interest in GWI other than as operator of the ECFiber network, and neither would have signed new employment agreements with full knowledge of GWI's dim prospects for continuing in that capacity beyond 2025. Thus, the information that GWI withheld was highly material to both of them.

GWI's misrepresentations and omissions mean that it is unlikely to prevail on the merits of this action. They also tip the balance of the equities strongly in favor of the Employees. The public interest, too, favors non-enforcement of contracts procured through deception.

### B. The Agreements Do Not Protect GWI's Legitimate Interests.

To be enforceable, a non-competition agreement must "protect a legitimate interest of the employer." *Sys. & Software, Inc.*, 2005 VT at ¶ 4 (quoting Restatement (Third) of Employment Law § 6.05 (Preliminary Draft No. 2, May 17, 2004)). "[W]hile an employer may seek to protect its legitimate interests through noncompetition agreements, 'the employer is not entitled to protection against ordinary competition." *Summits 7, Inc. v. Kelly*, 2005 VT 97, ¶ 7 (quotation marks omitted); *see also* 109 Causes of Action 2d 245, § 7 (Sept. 2025 Update) ("Where there is no specific business interest that the covenant is intended to protect, however, the effect of a contract is merely to stifle normal competition, thereby promoting monopoly power at the public expense, and is thus unreasonable and unenforceable."). Here, because of the unique nature of the ECFiber network, GWI has no legitimate interest to protect by enforcing the non-competition clauses in the Employees' contracts.

10

As the Court is aware, ECFiber is the only fiber Internet provider for 31 municipalities in eastern-central Vermont. It serves those 31 municipalities, and only those 31 municipalities, by design. The idea behind Communications Union Districts is that they form a patchwork of broadband coverage across the state, with each "patch" covering a particular service territory that does not encroach into another patch. *See generally* 30 V.S.A. §§ 3051-3054 (detailing formation requirements, composition, and powers of Communications Union Districts). Consistent with that concept, the edges of ECFiber's service territory are where other Communications Union Districts have established service, and ECFiber does not seek to compete with those other entities, which operate outside of its service territory.

Because of this unique setup established by the Legislature, this is not a typical non-competition case where employees are going from one widget-maker employer to another, both of which compete for the business of the widget-purchasing public. If VISPO administers the ECFiber network for the next ten years, GWI will not be competing for ECFiber subscribers because GWI does not have its own network of fiber-optic cables to deliver internet access to businesses and households in ECFiber's member municipalities.

Instead, internet users within ECFiber's territory will use ECFiber's network regardless of who operates it, and ECFiber's territory is unlikely to expand because its edges all border other Communication Union Districts. Particularly given that GWI inherited much of the ECFiber network – and its workforce – from ValleyNet, GWI has no legitimate interest in locking up ECFiber employees with non-competition agreements designed to prevent a would-be successor entity to pick up, as GWI once did, where its predecessor left off.

Elsewhere in its Motion, GWI expresses concern that, because VISPO has stated that it may seek to administer networks other than ECFiber, GWI is concerned that VISPO will use the Employees to solicit the business of other Communication Union Districts or systems. (Motion

11

at 11-12.) Initially, it bears noting that VISPO has not announced any intention to do anything other than administer ECFiber; it has only said that it *might* be capable of doing such a thing at some point in the future. But more to the point, this argument conflates the covenant of non-solicitation with the covenant of non-competition. Both were fraudulently obtained in the same agreement. *See* Doc. 1-1, § 4(b)(i)-(ii) (distinct covenants in Klinck employment agreement). But even if they weren't, the Employees have no plans to solicit or be involved with any network other than ECFiber on behalf of VISPO.

GWI also leans on allegations that the Employees have access to its confidential information, and for that reason should be enjoined from working for VISPO. (Motion at 13.) But as noted above, the Employees are at a loss for what information of GWI's they could have obtained that is confidential or proprietary.[5] GWI never gets specific about exactly what confidential information the Employees have and why that information is proprietary to GWI. It bears noting that in a decision in a related case, the Court concluded that GWI did not present sufficient evidence to support the concern that the District would misappropriate its trade secrets. (Docket 2:25-cv-354, Doc. 47, at 7.) GWI similarly does not present sufficient evidence of that concern here.

Because GWI's non-competition agreement does not protect GWI's legitimate business interests, GWI is unlikely to succeed on the merits of this action.

### C.  It Is Not In The Public Interest To Grant Injunctive Relief.

---

[5]     GWI alleges, for example, that it devoted hundreds of hours to training Mr. Klinck on "setting up a new internet hub for Lyme Fiber." To Mr. Klinck's recollection, that process involved replacing a component of the existing Lyme Fiber infrastructure – an infrastructure that existed prior to Mr. Klinck joining GWI. To do that work, Mr. Klinck collaborated with a Maine-based employee to discuss exactly how to do it. But nothing about that conversation involved GWI's confidential or proprietary information. Rather, it was a discussion about the best way to use the employees' collective industry knowledge to solve a problem.

Finally, the Court should consider what will happen to the ECFiber network and its subscribers if it grants GWI's request for injunctive relief. As GWI notes in its Motion, individuals capable of building and maintaining a network like ECFiber are "exceedingly difficult to identify" in ECFiber's rural and sparsely populated" service territory. (Motion at 12.) GWI has prevented "almost all" of those individuals from working for any other entity capable of administering the ECFiber network for a year. (Motion at 6.)

GWI's gambit appears to be to enlist the Court to prevent any other entity (VISPO or otherwise) from employing its exceedingly rare employees to administer the ECFiber network, effectively leaving the District no choice but to renew GWI's contract at whatever per-subscriber rate GWI demands, because at that point GWI will have an artificial monopoly on the District's business. The District may, understandably, balk at such demands, creating a game of chicken where *no one* is administering ECFiber for a time.

It is decidedly not in the public interest for GWI to engage in anti-competitive behavior that forces ECFiber to extend GWI's operating agreement. A ruling in GWI's favor holds significant potential to disrupt reliable Internet access for ECFiber's 10,000 subscribers, which for the same reasons is not in the public interest. As the Court itself observed in related litigation, it is not in the public interest for "the broadband communication network in the rural areas of Vermont provided by the District [to] experience significant disruption." (Docket 2:25-cv-354, Doc. 47, at 16.)

DATED at Burlington, Vermont, this 26th day of September, 2025.

**COREY KLINCK and**
**ANDREW OBERHOLZER**

By:    */s/ Kevin A. Lumpkin, Esq.*
       Kevin A. Lumpkin, Esq.
       SHEEHEY FURLONG & BEHM P.C.
       30 Main Street, 6th Floor, P.O. Box 66

Burlington, Vermont 05402-0066
(802) 864-9891
klumpkin@sheeheyvt.com

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Corey Klinck, declare that I have read the foregoing Opposition and verify that the factual allegations set forth regarding my employment with GWI and the circumstances under which I signed the agreement GWI seeks to enforce are true and accurate to the best of my knowledge, information, and belief.  I declare under penalty of perjury that the foregoing is true and correct.


09/26/2025

_____
Date

_____
Corey Klinck


Pursuant to 28 U.S.C. § 1746, I, Andrew Oberholzer, declare that I have read the foregoing Opposition and verify that the factual allegations set forth regarding my employment with GWI and the circumstances under which I signed the agreement GWI seeks to enforce are true and accurate to the best of my knowledge, information, and belief.  I declare under penalty of perjury that the foregoing is true and correct.


09/26/2025

_____
Date

_____
Andrew Oberholzer

# 2025-09-26 Opposition to Motion for Preliminary Injunction

**Final Audit Report**                                              2025-09-26

| | |
|---|---|
| Created: | 2025-09-26 |
| By: | Francis DiMora (fdimora@sheeheyvt.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAeiXTdBDXvapR_LjVxreAdMbUFFm8BjGr |

## "2025-09-26 Opposition to Motion for Preliminary Injunction" History

📄 Document created by Francis DiMora (fdimora@sheeheyvt.com)
2025-09-26 - 6:52:38 PM GMT

✉ Document emailed to Corey Klinck (corey.klinck@gmail.com) for signature
2025-09-26 - 6:52:43 PM GMT

✉ Document emailed to Andrew Oberholzer (andrew.j.oberholzer@gmail.com) for signature
2025-09-26 - 6:52:43 PM GMT

📄 Email viewed by Andrew Oberholzer (andrew.j.oberholzer@gmail.com)
2025-09-26 - 6:54:54 PM GMT

✍ Document e-signed by Andrew Oberholzer (andrew.j.oberholzer@gmail.com)
Signature Date: 2025-09-26 - 7:02:21 PM GMT - Time Source: server

📄 Email viewed by Corey Klinck (corey.klinck@gmail.com)
2025-09-26 - 7:06:02 PM GMT

✍ Document e-signed by Corey Klinck (corey.klinck@gmail.com)
Signature Date: 2025-09-26 - 7:07:00 PM GMT - Time Source: server

✔ Agreement completed.
2025-09-26 - 7:07:00 PM GMT

📕 **Adobe Acrobat Sign**